11-1266, 11-1474, 11-655
R.E., M.E., et al  v. NYC Dep't of Education

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

(Argued: April 24, 2012      Decided: September 20, 2012)

Docket Nos. 11-1266-cv, 11-1474-cv, 11-655-cv

-------------------------------------------------------x

R.E., Individually, on behalf of J.E., M.E,
Individually, on behalf of J.E.,

          Plaintiffs-Appellees,

               -- v. --

New York City Department of Education,

          Defendant-Appellant.

-------------------------------------------------------x

R.K., by her parents R.K. and S.L.,

          Plaintiff-Appellee,

               -- v. --

New York City Department of Education,

          Defendant-Appellant.

-------------------------------------------------------x

E.Z.-L., by her parents R.L. and A.Z.,

          Plaintiff-Counter-Defendant-Appellant,

               -- v. --

1

New York City Department of Education,

Defendant-Counter-Claimant-Appellee.

-------------------------------------------------------x

B e f o r e :  WINTER, WALKER, and CABRANES, Circuit Judges.

Defendant New York City Department of Education ("the Department") appeals from an order of the United States District Court for the Southern District of New York (Robert W. Sweet, Judge) granting summary judgment to R.E. and M.E. on their claim for tuition reimbursement under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and a separate order of the District Court for the Eastern District of New York (Kiyo A. Matsumoto, Judge) granting summary judgment to R.K. on her claim for tuition reimbursement under the IDEA. Plaintiff-counter-defendant E.Z.-L. appeals from an order of the Southern District of New York (Sidney H. Stein, Judge) denying her claim for tuition reimbursement under the IDEA. These appeals were heard in tandem due to common questions of law. In resolving a central question presented by these appeals, we hold that courts must evaluate the adequacy of an IEP prospectively as of the time of the parents' placement decision and may not consider "retrospective" testimony regarding services not listed in the IEP. However, we reject a rigid "four-corners rule" that would

prevent a court from considering evidence explicating the written terms of the IEP.

In light of this holding and for further reasons we elaborate, we reach the following conclusions in the three appeals.  In R.E., no. 11-1266-cv, we find that the Department offered the student a free and appropriate public education ("FAPE") and REVERSE the decision of the district court.  In R.K., no. 11-1474-cv, we find that the Department failed to offer the student a FAPE and AFFIRM the decision of the district court.  In E.Z.-L., no. 11-655-cv, we find that the Department offered the student a FAPE and AFFIRM the decision of the district court.

TRACEY SPENCER WALSH, (Gary S. Mayerson, Maria C. McGinley, on the brief), Mayerson & Associates, New York, New York, for Plaintiffs-Appellees R.E. and M.E.

ALAN G. KRAMS (Kristin M. Helmers, Lesley Berson Mbaye, on the brief) for Corporation Counsel for the City of New York, NY, for Defendant-Appellant New York City Department of Education.

TRACEY SPENCER WALSH, (Gary S. Mayerson, Maria C. McGinley, on the brief), Mayerson & Associates, New York, New York, for Plaintiff-Appellee R.K.

ALAN G. KRAMS (Stephen J. McGrath, Kimberly Conway, Julie Steiner, on the brief) for Corporation Counsel

for the City of New York, NY, for Defendant-Appellant New York City Department of Education.

GARY S. MAYERSON, (Tracey Spencer Walsh, Brianne N. Dotts, on the brief), Mayerson & Associates, New York, New York, for Plaintiff-Counter-Defendant-Appellant E.Z.-L.

ALAN G. KRAMS (Kristin M. Helmers, Lesley Berson Mbaye, on the brief) for Corporation Counsel of the City of New York, NY, for Defendant-Appellee New York City Department of Education.

JOHN M. WALKER, JR., Circuit Judge:

These cases require us to resolve several legal issues related to the rights of disabled children under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. In these three cases, parents of autistic children (collectively and in their respective pairs, "the parents") declined school placements offered by the New York City Department of Education ("the Department") and placed their children in private schools. The parents brought due process claims against the Department for tuition reimbursement on the grounds that the Department's public school placement offers for their children were inadequate. In each case, the parents were initially granted relief following a hearing before an impartial hearing officer ("IHO"), but subsequently were denied relief after the IHO's decision was reversed on appeal by the state

4

review officer ("SRO"). In each case, the SRO relied in part on testimony from Department personnel about the educational program the student would have received if he or she had attended public school. The parents challenge the appropriateness of relying on such testimony, which for ease of reference we refer to in shorthand as "retrospective testimony."

In each case, the parents sought to have the SRO's determination reversed by the appropriate United States District Court, and in two of the three cases they succeeded. In R.E., no. 11-1266-cv, the District Court for the Southern District of New York (Robert W. Sweet, Judge) found that the Department failed to provide the student with a free and appropriate public education ("FAPE") and granted summary judgment for the parents. In R.K., no. 11-1474-cv, the District Court for the Eastern District of New York (Kiyo A. Matsumoto, Judge) similarly found that the Department failed to provide the student with a FAPE and granted summary judgment for the parents. In E.Z.-L., no. 11-655-cv, however, the District Court for the Southern District of New York (Sidney H. Stein, Judge) found that the Department had provided the student with a FAPE and granted it summary judgment.

Among the legal conclusions we reach, we conclude that the use of retrospective testimony about what would have happened if a student had accepted the Department's proposed placement must be limited to testimony regarding the services described in the

5

student's individualized educational program ("IEP").  Such testimony may not be used to materially alter a deficient written IEP by establishing that the student would have received services beyond those listed in the IEP.  In light of this and other legal conclusions, we reverse the decision of the district court in R.E., and we affirm the decisions of the district courts in R.K. and E.Z.-L.

**BACKGROUND**

**I. The Legal Framework**

Before delving into the facts of these cases, it is useful to understand the legal framework of the IDEA.  A state receiving federal funds under the IDEA must provide disabled children with a free and appropriate public education ("FAPE").  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005).  To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each such child.  See 20 U.S.C. § 1414(d); Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system).  The IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable

the child to meet those objectives." D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507-08 (2d Cir. 2006) (internal quotation marks omitted). The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).

In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education ("CSEs"). N.Y. Educ. Law § 4402(1)(b)(1); Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 123 (2d Cir. 1998). CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others. N.Y. Educ. Law § 4402(1)(b)(1)(a). The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program. Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107-08 (2d Cir. 2007).

If a parent believes that his child's IEP does not comply with the IDEA, the parent may file a "due process complaint" (a type of administrative challenge unrelated to the concept of constitutional due process) with the appropriate state agency. 20 U.S.C. § 1415(b)(6). In such cases, the IDEA mandates that states provide "impartial due process hearings" before impartial hearing officers ("IHOs"). Id. § 1415(f). Under New York's

7

administrative system, the parties first pursue their claim in a hearing before an IHO. N.Y. Educ. Law § 4404(1). Either party may then appeal the case to the state review officer ("SRO"), who may affirm or modify the IHO's order. Id. § 4404(2). Either party may then bring a civil action in state or federal court to review the SRO's decision. 20 U.S.C. § 1415(i)(2)(A).

**II. Facts**

Like most IDEA cases, the consolidated appeals before us are fact-intensive. We therefore find it necessary to set forth in some detail the facts of the three cases.

**A. R.E., No. 11-1266-cv**

**1. Background**

J.E., the son of R.E. and M.E., is an autistic child born in 1999. Since September 2002, J.E. has attended the private McCarton School ("McCarton") located in Manhattan. May 2007, R.E. and M.E. rejected the Department's offer of a 6:1:1 (six students, one teacher, one paraprofessional aide) classroom setting in a special public school for the 2007-08 school year. After the Department conceded that the 2007-08 placement had failed to provide a FAPE, the IHO found that the parents were entitled to reimbursement, which conclusion is not challenged in

this appeal.  J.E. continued at McCarton during the 2007-08 school year.

At McCarton, J.E. was in a classroom with five other children and a 1:1 student-to-teacher ratio (i.e., each student had his or her own teacher).  Each week he received approximately 30 hours of applied behavioral analysis ("ABA") therapy, which is an intensive one-on-one therapy that "involves breaking down activities into discrete tasks and rewarding a child's accomplishments."  Cnty. Sch. Bd. v. Z.P. ex rel. R.P., 399 F.3d 298, 301 (4th Cir. 2005) (internal quotation marks omitted).  He also received 1:1 speech and language therapy five times a week in 60-minute sessions, and 1:1 occupational therapy five times a week in 45-minute sessions.

**2. The IEP**

On May 21, 2008, the Department convened a CSE to develop an IEP for the 2008-09 school year.  Present at this meeting were R.E., J.E.'s father; Xin Xin Guan, the Department's representative; Jane O'Connor, a special education teacher; Jeanette Betty, a parent representative; Tara Swietek, J.E.'s head teacher at McCarton; Kelly Lynn Landris, a McCarton speech and language pathologist; Nipa Bhandari, a McCarton occupational therapist; and Ivy Feldman, McCarton's director.

Because J.E. had never attended public school, the CSE relied primarily on information it received from McCarton.  This

9

information consisted of an educational progress report, which explained J.E.'s aptitude with communication, cognition, social skills, and adaptive behaviors, and recommended continuation of his current course of 1:1 therapy; a speech and language progress report, which evaluated J.E.'s language abilities and recommended a continued course of five 60-minute sessions per week; and an occupational therapy progress report, which outlined J.E.'s progress and goals and recommended that he continue with his current course of five 45-minute sessions per week and continue to participate in yoga sessions. Additionally, Carol Schaechter, a Department employee, observed J.E. for one day at McCarton. Her report related J.E.'s activities and noted some behavioral problems. It made no recommendations.

The resulting IEP offered J.E. a 12-month placement in a special class in a public school with a staffing ratio of 6:1:1. It also provided J.E. with a dedicated full-time paraprofessional aide. The IEP included speech therapy, occupational therapy, and counseling as related services. The CSE also produced a Functional Behavioral Assessment ("FBA"). The FBA identified six problem behaviors that interfere with J.E.'s learning: scripting/self-talk, eye closing, vocal protests, impulsivity, anxiety, and escape behaviors. The CSE created a corresponding Behavior Intervention Plan ("BIP"), stating that prompting, redirection, positive reinforcement, token economy, and a written

schedule were the primary strategies that would be used to address J.E.'s problem behaviors.

On June 9, 2008, the Department mailed R.E. and M.E. a final notice of recommendation ("FNR") offering a classroom at P.S. 208 that provided the services listed in the IEP. After the parents visited P.S. 208, R.E. sent a letter to the Department rejecting the proposed placement because it lacked sufficient 1:1 instruction. R.E. stated that he would be willing to consider other placements, but that if none was offered, J.E. would continue at McCarton. The Department did not offer an alternative placement, and on February 11, 2009, the parents filed a Demand for Due Process seeking tuition reimbursement for the 2008-09 school year.

**3. The Due Process Hearing and IHO Determination**

At the due process hearing, Department psychologist Xin Xin Guan, who had represented the Department at the IEP meeting, testified that the CSE had reviewed all of the McCarton reports. Based on these documents, Guan believed that the IEP was appropriate. Specifically, she believed that the 6:1:1 staffing ratio "could provide [J.E.] with the support[] needed to address his academic and social-emotional needs." June 16, 2009 Hearing Transcript at 278-79, Joint Appendix ("J.A.") 306-07. She testified that she felt a non-public-school placement would be too restrictive, and that it would not hurt J.E. to be exposed to

11

methodologies besides ABA therapy. Guan further explained that she had developed the FBA and BIP based on the McCarton reports. She acknowledged that she lacked specific information about the frequency and duration of J.E.'s problem behaviors.

Peter De Nuovo, a special education teacher at P.S. 208, testified that he would have been J.E.'s teacher at P.S. 208. He described his classroom, noting that for the 2008-09 school year, he had five students in his class ranging from nine to twelve years old. He stated that he was supported by a classroom paraprofessional, Kesha Danc, who had about ten years' experience working with autistic children, and that, in addition, three of the students had their own paraprofessionals. De Nuovo described his methods of instruction. He also testified about techniques he would have used to remedy J.E.'s problem behaviors.

Two McCarton personnel, Joe Pierce and Ivy Feldman, countered the testimony of Guan and De Nuovo: they testified that J.E. requires 1:1 teacher support and would not be able to learn in a 6:1:1 setting.

On August 28, 2009, IHO William J. Wall issued a decision granting the parents' reimbursement request. He noted that the Department representatives had no personal knowledge of J.E., but the McCarton personnel did. He found that the evidence before the CSE did not support the conclusion that J.E. could succeed in a 6:1:1 setting because the only evaluations of J.E. stated that

he required 1:1 teacher support. Additionally, he found that the proposed IEP did not include the amount of related services recommended by the McCarton reports. The IHO concluded that "[t]he testimony and the evidence does not support the District's conclusion that a 6:1:1 program would be an educational setting that would be calculated to provide [J.E.] with meaningful educational progress." IHO Decision at 7, J.A. 673.

The IHO also faulted the Department for its failure to conduct an adequate FBA and develop an appropriate BIP. Although these documents were prepared, they purportedly failed to meet the criteria laid out in New York State regulations because they did not contain specific information about the frequency, duration, and intensity of the problem behaviors. See N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(a)(3), (b)(5). The IHO went on to find that the McCarton school was an appropriate placement and that J.E.'s parents were entitled to full tuition reimbursement.

**4. The SRO Decision**

The Department appealed, and on December 14, 2009, SRO Paul F. Kelly issued a lengthy opinion reversing the IHO and denying tuition reimbursement. The SRO concluded that the goals and objectives listed in the IEP were adequately linked to J.E.'s academic level and needs, and that, contrary to the IHO's finding, a 6:1:1 program was appropriate. The SRO noted De Nuovo's testimony that his class actually consisted of five

13

students and five adults (himself, the classroom aide, and the three dedicated paraprofessionals), and emphasized that the instructor and paraprofessionals were adequately trained and had appropriate credentials. Ultimately, the SRO concluded that "the hearing record illustrates that the recommended classroom would have been able to appropriately support the student with 1:1 paraprofessional support such that a FAPE was offered." SRO Opinion at 18, J.A. 701. The SRO further found that, although the McCarton reports indicated a need for 1:1 support, they did not suggest that 1:1 paraprofessional support would be insufficient.

The SRO went on to state that De Nuovo would have "adapted the New York State curriculum to meet the students' individual needs." Id. He cited specific examples from De Nuovo's testimony as to what strategies he would have used to work with J.E. The SRO also found that the lack of specific data in the FBA was not fatal to the IEP. He noted that the IEP contained strategies to deal with J.E.'s problem behaviors and also referred to specific strategies that De Nuovo would have used in the classroom. Finally, he concluded that the absence of parent training and counseling from the written IEP was acceptable because the record showed that adequate counseling opportunities would have been available at P.S. 208.

14

**5. Proceedings in the District Court**

The parents then brought this action in the United States District Court for the Southern District of New York seeking a reversal of the SRO's decision. On March 11, 2011, the district court granted summary judgment for the parents and reversed the SRO. R.E. v. N.Y.C. Dep't of Educ., 785 F. Supp. 2d 28 (S.D.N.Y. 2011). The district court found that the SRO had based his conclusion on "after-the-fact testimony . . . as to what the teacher, De Nuovo, would have done if J.E. had attended his class." Id. at 41. It adopted the rule that "[t]he sufficiency of the IEP is determined from the content within the four corners of the IEP itself." Id. at 42. The district court found that the SRO had reversed the IHO primarily on the basis of De Nuovo's testimony, and that there was no evidence in the record to support the SRO's conclusion that a 1:1 paraprofessional aide was adequate for J.E. Id. at 42-43. It further concluded that the SRO's decision was not based on educational policy, "particularly given that it relies so heavily on the testimony [of] individuals who lacked personal knowledge of J.E." Id. at 43. The Department appeals.

**B. R.K., No. 11-1474-cv**

### 1. Background

R.K., the daughter of R.K. and S.L., is an autistic child born in 2004. R.K. was first diagnosed with autism at age two. Prior to mid-2006, she received home-based therapy (occupational and speech therapy as well as ABA) through New York's Early Intervention Program. In July 2006, R.K. began a full-day preschool program at the Interdisciplinary Center for Child Development ("ICCD"). She was placed in an 8:1:3 classroom (eight students, one teacher, three classroom aides), and received separate speech and language therapy and occupational therapy three times each week in 30-minute 1:1 sessions. Starting in September 2007, R.K. received five two-hour 1:1 ABA therapy sessions per week at home through TheraCare.

### 2. The IEP

On April 29, 2008, the CSE met to create an IEP for R.K. for the 2008-09 school year. Present at the meeting were R.K.'s parents; Dr. Wanda Enoch, the Department representative; Tracy Spiro, a special education teacher; Rita Halpern, a general education teacher; a parent representative; and a school social worker. The CSE reviewed extensive reports on R.K., including a pediatric report by neurologist Dr. John T. Wells, which concluded that R.K. was high-functioning autistic and should continue with an ABA-based program; a social history update from

16

ICCD, which concluded that the ABA method was effective for R.K. and that she should remain in a small, structured environment; a psycho-educational evaluation by school psychologist Chris Starvopoulos, finding that R.K. was too unstable to be evaluated but opining that she required a highly structured environment; a TheraCare age-out report concluding that R.K. required continued 1:1 special education services, as well as related services; a progress report from ICCD, prepared by Tracey Spiro, concluding that R.K. would benefit from a small and highly structured classroom environment; a speech progress report from the ICCD, again recommending a small, structured learning environment and three 1:1 speech and language sessions per week; an occupational therapy progress report from ICCD recommending three occupational therapy sessions per week; a private evaluation by the McCarton Center, recommending 40 hours of 1:1 ABA therapy per week, "manding" sessions (in which a child is shown reinforcing items she can access upon request), five 60-minute speech and language therapy sessions per week, five 60-minute occupational therapy sessions per week in a sensory gym, and two hours of ABA training per week for the parents; and a checklist prepared after a preschool observation of R.K recommending a 6:1:1 classroom.

The resulting IEP offered a 6:1:1 class in a special public school. It offered speech and language therapy and occupational therapy, each three times a week in 30-minute sessions. It

17

stated that R.K. demonstrated "self-stimulatory behaviors which interfere[d] with her ability to attend to tasks and to socially interact with others."  IEP at 3, J.A. 610.  However, it concluded that her behavior "does not seriously interfere with instruction and can be addressed by the . . . special education classroom teacher."  IEP at 4, J.A. 612.

On May 7, 2008, before the parents received a final placement offer from the Department, they signed a contract to enroll R.K. in the Brooklyn Autism Center ("BAC"), a private school.  The contract allowed the parents to withdraw prior to September 10, 2008, and be reimbursed for their tuition payments minus a $1,000 non-refundable deposit.  On June 12, 2008, the Department provided R.K.'s parents with an FNR offering her a classroom at "P075Q @ Robert E. Peary Schl" ("P075Q").  On June 26, 2008, the parents notified the Department that they rejected the proposed placement and would be sending R.K. to BAC.  They primarily cited inadequate 1:1 ABA support in the IEP.

**3. The Due Process Hearing and IHO Determination**

On June 27, 2008, the parents filed a Demand for Due Process seeking reimbursement for their 2008-09 tuition at BAC.  IHO Mary Noe held a hearing on January 7 and 8, 2009.  At the hearing, Jamie Nicklaus, the Educational Director at BAC, testified that R.K. required 1:1 instruction to make progress.  Leonilda Perez, who would have been R.K.'s teacher at P075Q, testified about her

18

classroom practices. She stated that she used a method called Treatment and Education of Autistic and Communication–Related Handicapped Children ("TEACCH") with some elements of ABA. The TEACCH method differs from ABA therapy in that it places greater emphasis on visual skills, independent work, and group instruction. See Z.P., 399 F.3d at 302. Perez testified that she conducted 1:1 ABA sessions, including manding, with each student. Perez further stated that, based on the information in R.K.'s IEP, she might have had to create a BIP for R.K.

Dr. Enoch, a school psychologist and the Department's representative at the CSE, testified that a 1:1 setting would be too restrictive for R.K. and that it would be better for her to interact with a small group. She stated that no formal FBA or BIP was necessary because R.K.'s preschool teacher said she was "no behavior problem." January 7, 2009 Hearing Transcript at 144-45, J.A. 82-83. Desiree Sandoval, the parent coordinator at P075Q, testified that the school would have provided various counseling and training opportunities for the parents at their request.

On February 25, 2009, the IHO issued a decision awarding tuition reimbursement to R.K.'s parents. Based on the record, the IHO found that there was "no one unanimous theory as to whether this student needs 1:1 or just a highly structured environment. There is a consensus that the student needs an ABA

19

program, speech and language and occupational therapy." IHO Opinion at 5, J.A. 677. The IHO found that because the IEP's recommended program was a 6:1:1 classroom and provided only 25 minutes of 1:1 ABA therapy per day, it did not have an adequate level of support for R.K.

However, the IHO found that the parents were entitled to only partial reimbursement because the BAC program selected by the parents met only part of R.K.'s special education needs and provided more individualized instruction than her assessments warranted. The IHO noted that R.K. received 1:1 therapy all day, which she felt was more restrictive than warranted by R.K.'s providers' consistent recommendations of a small, structured environment. Additionally, she found that no therapies were provided in the BAC classroom and there were no integrated efforts by therapists and teachers. The IHO then calculated the appropriate award by multiplying the Department's rate for ABA therapists ($45 per hour, less than the $62.50 per hour charged by BAC) times the number of hours of 1:1 ABA instruction (an estimate created by halving the total number of school hours). She arrived at an award of $32,400. BAC's tuition is $90,000 per year.

**4. The SRO Decision**

The Department appealed, and on June 19, 2009, SRO Kelly issued a decision reversing the IHO and denying tuition

reimbursement entirely. He found that the IEP provided an adequate program to address R.K.'s speech and language deficits as well as her motor sensory deficits because it provided for speech and language therapy and occupational therapy. Relying extensively on Perez's testimony about her classroom methods, the SRO found that the proposed 6:1:1 program was sufficient. He noted that Perez used TEACCH methodology with some elements of ABA, and stated that R.K. would have received 25 minutes of 1:1 ABA instruction per day, including manding. The SRO also found, based on Perez's testimony, that she would have conducted an FBA and developed a BIP to address R.K.'s problem behaviors. Ultimately, the SRO found that "[t]he hearing record indicates that the recommended 6:1+1 class would have provided the student with a small, highly structured classroom environment along with the opportunity to interact with peers. . . . In addition, the student would have received individual instruction and that instruction would have been ABA-based." SRO Opinion at 19, J.A. 762.

The SRO dismissed the concern that the IEP did not include parent training or counseling, as required by state regulation, because of Sandoval's testimony that the P075Q would have provided parent training and counseling. Similarly, he found that although the IEP did not include the required 30-60 minutes of daily speech therapy, Perez had testified that this therapy

21

was incorporated into her class, and the requirement was therefore satisfied.  Finally, the SRO acknowledged that no FBA or BIP had been completed but found that this did not amount to a denial of a FAPE because Perez would have created a BIP and the parents had not articulated how R.K. would have been harmed by not having a BIP in place before entering the class.

**5. Proceedings in the District Court**

R.K.'s parents then initiated the present action seeking a reversal of the SRO's decision and full tuition reimbursement. On January 21, 2011, Magistrate Judge Roanne L. Mann issued a recommendation that summary judgment be granted for the parents. R.K. ex rel. R.K. v. N.Y.C. Dep't of Educ., No. 09-CV-4478 (KAM), 2011 WL 1131492 (E.D.N.Y. Jan. 21, 2011).  She concluded that the Department's failure to conduct an FBA and develop a BIP was significant because the record plainly established that R.K.'s behavioral problems impeded her learning.  Id. at *17-20; see also N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v).  She found that the goals and objectives in the IEP were not adequate because they did not provide specific strategies for addressing problem behaviors.  R.K., 2011 WL 1131492, at *19; see also N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(b)(4).  Judge Mann rejected as insufficient Perez's testimony that she would have created a BIP once R.K. was in her class.  R.K., 2011 WL 1131492, at *20.

22

Notably, Judge Mann rejected testimony offered by the Department to attempt to overcome omissions in the IEP: "More broadly, the Court rejects, as fundamentally flawed, the DOE's invitation to the Court to overlook deficiencies in the IEP based on subsequent testimony that the recommended placement might have later sought to cure those deficiencies." Id. Following similar reasoning, Judge Mann rejected the SRO's reliance on testimony that, despite being omitted in the IEP, parent counseling and speech and language therapy would have been provided in practice. Id. at *21.

Judge Mann also rejected the SRO's conclusion that the proposed 6:1:1 placement was sufficient. She noted that, although R.K. would have received 25 minutes of 1:1 ABA per day, the consensus view of the professional evaluations was that this amount of 1:1 support would be insufficient. Id. at *23. She further noted that 1:1 instruction is not inconsistent with a small group setting. Id. at *24.

Ultimately, Judge Mann concluded that the IEP was inadequate and R.K. had been denied a FAPE. She determined that the SRO had ignored the clear consensus of R.K.'s evaluators and failed to consider the cumulative effect of the numerous procedural deficiencies. Id. at *24-25. She disagreed with the IHO's partial award determination and recommended that the parents receive full reimbursement. Id. at *27-30. On March 28, 2011,

23

the United States District Court for the Eastern District of New York (Kiyo A. Matsumoto, <u>Judge</u>) adopted the magistrate's recommendation in full, over the Department's objection. <u>R.K. ex rel. R.K. v. N.Y.C. Dep't of Educ.</u>, No. 09-CV-4478 (KAM) (RLM), 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011). The Department appeals.

**C. <u>E.Z.-L.</u>, No. 11-655-cv**

    **1. Background**

E.Z.-L., the daughter of R.L. and A.Z., is an autistic child born in 2002. Since September 2005, E.Z.-L. has attended the Rebecca School, a private school located in Manhattan. In 2007, the Department offered E.Z.-L. a placement for the 2007-08 school year. The parents rejected this placement and re-enrolled her at the Rebecca School. The parents then sought tuition reimbursement. During the due process hearing, the Department conceded that it had failed to provide a FAPE, but argued that the Rebecca School was not an appropriate placement. The IHO concluded that the Rebecca School was appropriate and awarded the parents tuition for the 2007-08 school year. The Department did not appeal.

    **2. The IEP**

On April 30, 2008, a CSE met to create an IEP for E.Z.-L. for the 2008-09 school year. Present at the meeting were Feng

Ye, a special education teacher acting as the Department's representative; a Department general education teacher; a parent representative; a social worker from the Rebecca School; and Rebecca Starr, E.Z.-L.'s teacher at the Rebecca School. The CSE reviewed numerous documents from the Rebecca School and private clinicians, including a January 2, 2008 occupational therapy progress report, which described E.Z.-L.'s ability to use a sensory gym; a January 2008 progress report from the Rebecca School detailing E.Z.-L.'s progress in a number of areas; a February 6, 2008 speech and language progress report recommending continued speech interventions; a March 30, 2008 occupational therapy progress report, which recommended occupational therapy three times per week individually and once per week in a dyad (group of two); an April 2008 speech and language progress report, which recommended continued speech and language therapy in three 30-minute sessions per week (two sessions individually, one in a dyad); and a May 2008 progress report, which showed notable progress in most areas.

The resulting IEP offered E.Z.-L. a place in a specialized public school with a staffing ratio of 6:1:1. It also included occupational therapy, speech and language therapy, and counseling. The IEP did not include an FBA or BIP because it found that E.Z.-L.'s behavior did not seriously interfere with instruction. On May 8, 2008, the Department issued an FNR

placing E.Z.-L. at the Children's Workshop School in Manhattan. On May 22, 2008, the parents sent a letter to the Department stating that, after visiting the proposed school, they rejected the Department's recommendation. The letter stated that the parents would consider other programs, but in the absence of another offer, would seek reimbursement for tuition at the Rebecca School. On June 25, 2008, the parents sent a followup letter reiterating their view that the proposed placement was inappropriate and notifying the Department that they would seek reimbursement for physical therapy and related services in addition to R.K.'s private tuition.

**3. The Due Process Hearing and IHO Determination**

On June 27, 2008, the parents filed a Demand for Due Process formally seeking reimbursement. A hearing was held before IHO Gary D. Peters over the course of five non-consecutive days in 2008 and 2009. At the hearing, Tina McCourt, the program director at the Rebecca School, testified about the school's methodology. The school uses the "DIR/Greenspan/floor time" approach, which involves sensory gyms and frequent assessments aided by video monitoring.[1] McCourt testified that the sensory

---

[1] DIR stands for "Developmental Individual-difference Relationship-based" therapy. Unlike ABA, which is a behavioral therapy, DIR is primarily based on helping the child build relationships and reach a higher developmental level. See <u>A.D. v. Bd. of Educ. Of City Sch. Dist. of City of N.Y.</u>, 690 F. Supp. 2d 193, 198-99 (S.D.N.Y. 2010).

gym is particularly important for E.Z.-L. Rebecca Starr, E.Z.-L.'s teacher at the Rebecca School, testified about E.Z.-L.'s class. The class contains seven or eight students, and three assistant teachers, all of whom have at least a bachelor's degree. Starr described E.Z.-L. as very rigid and explained that she required a large amount of floor time to overcome this. Starr also described the speech therapy and DIR therapy provided at the Rebecca School.

A.Z., E.Z.-L.'s mother, testified that she had visited the Children's Workshop and had been told that it did not contain a sensory gym or offer DIR support. She recalled being told that the school conducted occasional parent training events that she could attend. A.Z. also described the "Throwback Sports" program, a recreational therapeutic program in which she had enrolled E.Z.-L., and for which she was seeking reimbursement from the Department.

Feng Ye, a Department special education teacher, explained that, although E.Z.-L. had a history of biting her hands and hitting herself, the IEP team declined to create an FBA or BIP because it believed E.Z.-L.'s behaviors could be addressed by the classroom teacher. Susan Cruz, an assistant principal at P.S. 94, testified about the Children's Workshop (which was an off-site part of P.S. 94). Cruz testified about the classroom in which E.Z.-L. would have been placed. She explained that E.Z.-

27

L.'s teacher would have used TEACCH methodology with some ABA. Cruz opined that a sensory diet could have been implemented by an occupational therapist and that the school contained a sensory room. She further stated that most of the teachers at the school do use floor time. Finally, Cruz testified that the school provides training for parents on an as-needed basis.

On March 24, 2009, the IHO issued a decision awarding reimbursement to E.Z.-L.'s parents. The IHO found that the Department should have conducted an FBA and created a BIP in light of Ye's admission that E.Z.-L. exhibited self-injurious behaviors. He also found that the IEP failed to include the required parent training and counseling. The IHO concluded that the Department's failure to recommend a specific placement at the IEP meeting was a procedural violation because parents may join "any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e). The IHO was skeptical of Ye's testimony, noting that she had never worked with autistic children and that she had attended approximately 200 CSE meetings in the spring of 2008 and thus had difficulty remembering exactly what occurred at this particular meeting. The IHO also faulted the Department's failure to create a transition plan. He rejected Cruz's testimony that such a plan would have been created, noting that transition plans necessarily must be completed in advance.

28

For these reasons, the IHO concluded that E.Z.-L. had been denied a FAPE. He further determined that the Rebecca School, along with E.Z.-L.'s additional services, were appropriate and that the parents were entitled to reimbursement.

**4. The SRO Decision**

The Department appealed, and on June 26, 2009, SRO Kelly issued an opinion reversing the IHO and denying tuition reimbursement. The SRO found that the failure to conduct an FBA or create a BIP was not a violation because Rebecca Starr, E.Z.-L.'s teacher, felt that one was not necessary. He further found that the failure to include parent training in the IEP was not a violation because training would have been provided by the school as needed.

With regard to parent involvement in placement decisions, the SRO found that the failure to recommend a specific school during the CSE meeting was not a violation because the requirement of parent involvement only applies to the general structure of a placement, not the choice of a specific site. He also found that the failure to develop a transition plan did not amount to a denial of a FAPE because there was no evidence that E.Z.-L. had been harmed by the lack of a plan and the record showed that the proposed school would have been responsive to any issues arising from her transfer.

After examining the IEP, the SRO concluded that the proposed program adequately took into account E.Z.-L.'s difficulties and abilities and was reasonably calculated to confer educational benefit. Based on Cruz's testimony about the Children's Workshop, he concluded that it would have met E.Z.-L.'s needs.

**5. Proceedings in the District Court**

E.Z.-L.'s parents then instituted this action seeking reversal of the SRO's decision. On January 24, 2011, the United States District Court for the Southern District of New York granted summary judgment in favor of the Department. <u>E.Z.-L. ex rel. R.L. v. N.Y.C. Dep't of Educ.</u>, 763 F. Supp. 2d 584 (S.D.N.Y. 2011). The district court agreed with the SRO that the Department had provided a FAPE and had not committed any procedural or substantive violations, and accordingly denied reimbursement. The parents appeal.

**DISCUSSION**

Although each of the three cases on appeal involves individualized and unrelated facts, we address them in a single opinion because they involve common issues of law. Accordingly, we first examine these common issues before applying the law to each individual case.

**I. Legal Framework**

"We review de novo the district court's grant of summary judgment in an IDEA case. Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." A.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009) (internal citations omitted). A federal court reviewing a dispute over an IEP must base its decision on the preponderance of the evidence. Id. Moreover, we must defer to the administrative decision because "the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. Deference is particularly appropriate when the state officer's review "has been thorough and careful," but still we do not "simply rubber stamp administrative decisions." Walczak, 142 F.3d at 129.

Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing.[2] If the board fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and

_____
[2] Although the Supreme Court has not decided whether a state-imposed burden in an initial hearing also applies in a subsequent federal suit, see Schaffer v. Weast, 546 U.S. 49, 62 (2005), we need not decide that issue here, see M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 225 n.3 (2d Cir. 2012).

that the equities favor them. <u>Cerra</u>, 427 F.3d at 192. This framework is known as the <u>Burlington</u>/<u>Carter</u> test. <u>See</u> <u>Florence Cnty. Sch. Dist. Four v. Carter</u>, 510 U.S. 7 (1993); <u>Sch. Comm. of Town of Burlington v. Dep't of Educ.</u>, 471 U.S. 359 (1985).

The parties have presented four common questions of law that we must resolve before turning to each case individually: First, when, if ever, is it permissible for a district to augment the written IEP with retrospective testimony about additional services that would have been provided at the proposed placement; second, when an IHO and SRO reach conflicting conclusions, what deference should a court pay to each; third, at what point do violations of state regulations governing the IEP process amount to a denial of a FAPE entitling the parents to reimbursement; and finally, must parents be involved in the selection of a specific school for their child?

**Retrospective Testimony**

This appeal primarily calls upon us to consider the appropriateness of what we have labeled "retrospective testimony," <u>i.e.</u>, testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement. In each of the cases now before us, the Department offered retrospective testimony at the IHO hearing to overcome

32

deficiencies in the IEP, and the SRO relied on this retrospective testimony in varying degrees to find that the Department had provided a FAPE.

The parents urge us to adopt a rigid "four corners" rule prohibiting any testimony about services beyond what is written in the IEP.  The Department counters that review should focus on the services the child would have actually received and therefore should include evidence of services beyond those listed in the IEP.  Although we decline to adopt a four corners rule, we hold that testimony regarding state-offered services may only explain or justify what is listed in the written IEP.  Testimony may not support a modification that is materially different from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP.

The permissibility of retrospective testimony is an open question in this circuit.  See D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598-99 (2d Cir. 2005) ("[T]his court has not, as yet, decided if it is error to consider retrospective evidence in assessing the substantive validity of an IEP."). Three of our sister circuits have addressed similar, though not identical, questions and have disfavored retrospective evidence. See Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999) ("[W]e examine the adequacy of [the IEPs] at the time the plans were

33

drafted."); Carlisle Area Sch. v. Scott P., 62 F.3d 520, 530 (3d Cir. 1995) (holding that an IEP must be judged prospectively from the time of its drafting); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990) ("[A]ctions of school systems cannot . . . be judged exclusively in hindsight.  An IEP is a snapshot, not a retrospective.").  They are in agreement that the IEP should be evaluated prospectively as of the time of its drafting.

The same conclusion has been reached by a number of district courts in this circuit.  See R.E., 785 F. Supp. 2d at 41-42; R.K., 2011 WL 1131492, at *20; J.R. v. Bd. of Educ. of City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004); Antonaccio v. Bd. of Educ., 281 F. Supp. 2d 710, 724 (S.D.N.Y. 2003).  But see E.Z.-L., 763 F. Supp. 2d at 597-98 (finding that lack of parent training provision in IEP did not amount to a violation because hearing testimony established that school would have provided training); M.N. v. N.Y.C. Dept. of Educ., 700 F. Supp. 2d 356, 368 (S.D.N.Y. 2010) (same).

We now adopt the majority view that the IEP must be evaluated prospectively as of the time of its drafting and therefore hold that retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a Burlington/Carter proceeding.

34

The Supreme Court has long recognized that the IDEA allows parents to reject an IEP they feel is inadequate, place their child in an appropriate private school, and seek tuition reimbursement from the school district. See Burlington, 471 U.S. at 369-70 (construing IDEA's authorization for courts to award "appropriate" relief); see also Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 242-43 (2009) (finding that amendments to the IDEA do not abrogate the Burlington decision). In order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision. At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents. Under the Department's view, a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim at a Burlington/Carter hearing with evidence that effectively amends or fixes the IEP by showing that the child would, in practice, have received the missing services. The Department's view is incorrect. By requiring school districts to put their efforts into creating adequate IEPs at the outset, IDEA prevents a school district from effecting this type

35

of "bait and switch," even if the baiting is done unintentionally.  A school district cannot rehabilitate a deficient IEP after the fact.

We reject, however, a rigid "four corners" rule prohibiting testimony that goes beyond the face of the IEP.  While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP.  See D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564-65 (3d Cir. 2010) ("[A] court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time they were made.").  For example, if an IEP states that a specific teaching method will be used to instruct a student, the school district may introduce testimony at the subsequent hearing to describe that teaching method and explain why it was appropriate for the student.  The district, however, may not introduce testimony that a different teaching method, not mentioned in the IEP, would have been used.  Similarly, if a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate.  It may not introduce evidence that modifies this staffing ratio (such as testimony from a teacher

that he would have provided extensive 1:1 instruction to the student).

The prospective nature of the IEP also forecloses the school district from relying on evidence that a child would have had a specific teacher or specific aide.  At the time the parents must decide whether to make a unilateral placement based on the IEP, they may have no guarantee of any particular teacher.  Indeed, even the Department cannot guarantee that a particular teacher or aide will not quit or become otherwise unavailable for the upcoming school year.  Thus, it is error to find that a FAPE was provided because a specific teacher would have been assigned or because of actions that specific teacher would have taken beyond what was listed in the IEP.  The appropriate inquiry is into the nature of the program actually offered in the written plan.

Contrary to the Department's assertions, this rule does not unfairly skew the reimbursement hearing process.  Parents who end up placing their children in public school cannot later use evidence that their child did not make progress under the IEP in order to show that it was deficient from the outset.[3]  See Scott

---

[3] However, evidence that the school district did not follow the IEP as written might be relevant in a later proceeding to show that the child was denied a FAPE because necessary services included in the IEP were not provided in practice.  See K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 811 (8th Cir. 2011); Bend-Lapine Sch. Dist. v. D.W., 152 F.3d 923, 1998 WL 442952, at *3 (9th Cir. 1998) (table).

It is true that, if an IEP is determined to be inadequate, the

P., 62 F.3d at 530. In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision. See Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1039-40 (3d Cir. 1993) ("Rowley requires, at the time the initial evaluation is undertaken, an IEP need only be 'reasonably calculated to enable the child to receive educational benefits.' . . . [T]he measure and adequacy of the IEP can only be determined as of the time it is offered to the student, not at some later date." (quoting Rowley, 458 U.S. at 206-07)).

An important feature of the IDEA is that it contains a statutory 30-day resolution period once a "due process complaint" is filed. 20 U.S.C. § 1415(f)(1)(B). That complaint must list all of the alleged deficiencies in the IEP.[4] The Department then

---

parents may provide evidence that the child made actual progress at their chosen private placement to support the adequacy of that placement. See Frank G. v. Bd. of Educ., 459 F.3d 356, 364-65 (2d Cir. 2006). However, review of the private placement at that stage of Burlington/Carter review is more informal than review of the original IEP: a private placement need not meet the IDEA requirement for a FAPE and is not subject to the same mainstreaming requirement as a public placement. Id. at 364. Additionally, the primary problem with retrospective testimony – namely, that it prevents parents from making a fully informed decision about whether to make a unilateral private placement – will usually not apply to private placements, because the school district does not rely in any way on the adequacy of the alternative program.

[4] The parents must state all of the alleged deficiencies in the IEP in their initial due process complaint in order for the resolution period to function. To permit them to add a new claim

has thirty days to remedy these deficiencies without penalty. If, at the end of the resolution period, the parents feel their concerns have not been adequately addressed and the amended IEP still fails to provide a FAPE, they can continue with the due process proceeding and seek reimbursement. The adequacy of the IEP will then be judged by its content at the close of the resolution period.

Because of this resolution period, there is no danger that parents will take advantage of a school district by failing to alert it to IEP deficiencies and subsequently recover tuition based on those deficiencies. A school district that inadvertently or in good faith omits a required service from the IEP can cure that deficiency during the resolution period without penalty once it receives a due process complaint. If, however, the school district fails to rehabilitate an inadequate IEP within the resolution period, it may not later benefit from the use of retrospective evidence - that is, evidence showing that a child's public education would have been materially different than what was offered in the IEP. Similarly, parents are precluded in later proceedings from raising additional defects in the IEP that they should have raised from the outset, thus giving the school district a chance to cure the defects without penalty.

after the resolution period has expired would allow them to sandbag the school district. Accordingly, substantive amendments to the parents' claims are not permitted.

Our holding today is not inconsistent with our previous holding in T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 417-19 (2d Cir. 2009). In T.Y., after finding the IEP appropriate, the IHO and SRO amended it to include additional required services that had been omitted. We upheld this decision. The Department contends that our endorsement of a retroactive amendment to the IEP implicitly allows the use of retrospective evidence. Crucially, however, in T.Y. the IEP was never found to be defective. Thus, neither the IHO nor the SRO used retrospective evidence to remedy a defective IEP; instead they altered an adequate IEP. See id. at 417 ("[T]he IHO determined that [the lack of certain services] alone did not establish that the overall program recommended by the CSE was inappropriate."). When an IEP adequately provides a FAPE, it is within the discretion of the IHO and SRO to amend it to include omitted services.

Accordingly, we hold that, with the exception of amendments made during the resolution period, an IEP must be evaluated prospectively as of the time it was created. Retrospective evidence that materially alters the IEP is not permissible. This rule recognizes the critical nature of the IEP as the centerpiece of the system, ensures that parents will have sufficient information on which to base a decision about unilateral placement, and puts school districts on notice that they must

include all of the services they intend to provide in the written plan. If a school district makes a good faith error and omits a necessary provision, they have thirty days after the parents' complaint to remedy the error without penalty.

**II. Deference to State Decision Makers**

In each of the cases before us, the IHO's decision was reversed on appeal by the SRO. The parties dispute the degree of deference that should be afforded to these two state officers. The Department contends that we should defer entirely to the SRO's views and give no weight to the earlier IHO's opinion. The parents urge that the SRO's opinions were not sufficiently reasoned to warrant deference and that consideration of the IHO's opinion is appropriate.

"[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112-13 (2d Cir. 2007). We must give "due weight" to the state proceedings, mindful that we lack "the specialized knowledge and experience necessary to resolve . . . questions of educational policy." Id. at 113. It is not for the federal court to "ch[oose] between the views of conflicting experts" on such questions. Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003). When an IHO and SRO reach conflicting conclusions, "[w]e defer to

41

the final decision of the state authorities," that is, the SRO's decision. A.C., 553 F.3d at 171. But the question remains: how much deference?

In a recent opinion, this Circuit resolved the deference question now posed by the parties. See M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217 (2d Cir. 2012). Synthesizing our precedent on this issue, we concluded that the deference owed to an SRO's decision depends on the quality of that opinion. Reviewing courts must look to the factors that "normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." Id. at 244. However, courts must bear in mind the statutory context and the administrative judges' greater institutional competence in matters of educational policy. Id. The M.H. opinion offers several illustrative examples:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has

42

before it additional evidence that was not considered by the state agency.

Id. Where, as in our case, the IHO and SRO disagree, the general rule is that "courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." Id. at 246.

> However, when . . . the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.

Id. Therefore, a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead.

## III. Procedural Violations

In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive. At the first step, courts examine whether there were procedural violations of the IDEA, namely, "whether the state has complied with the procedures set forth in the IDEA." Cerra, 427 F.3d at 192. Courts then examine whether the IEP was

43

substantively adequate, namely, whether it was "'reasonably calculated to enable the child to receive educational benefit[s].'" Id. (quoting Rowley, 458 U.S. at 206-07). Substantive inadequacy automatically entitles the parents to reimbursement. Procedural violations, however, only do so if they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decisionmaking process," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); A.C., 553 F.3d at 172. Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not. See Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005).

Two specific procedural violations are common to all three cases under review: In each case, the Department failed to complete an adequate functional behavioral assessment ("FBA") and behavior intervention plan ("BIP"), and failed to include parent counseling in the IEP. New York regulations require the department to conduct an FBA for a student "whose behavior impedes his or her learning or that of others." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(b)(1)(v). The FBA includes "the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior . . . and the formulation

44

of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it."  Id. § 200.1(r).  When a student's behavior impedes his learning, a BIP must be developed with strategies to deal with the problem behavior(s).  Id. § 200.22(b).  We have held that failure to conduct an FBA is a procedural violation, but that it does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it.  A.C., 553 F.3d at 172.

The failure to conduct an adequate FBA is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all.  As described above, such a failure seriously impairs substantive review of the IEP because courts cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP.  The entire purpose of an FBA is to ensure that the IEP's drafters have sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors.  See Harris v. District of Columbia, 561 F. Supp. 2d 63, 68 (D.D.C. 2008) ("The FBA is essential to addressing a child's behavioral difficulties, and, as such, it plays an integral role in the development of an IEP.").

The failure to conduct an FBA will not always rise to the level of a denial of a FAPE, but when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors.  See A.C., 553 F.3d at 172 (finding that IEP provided appropriate strategies for student's problem behaviors when it (1) addressed student's attention problem by providing a personal aide to keep child focused and (2) addressed child's "minimal" tangential and fantasy speech with psychiatric and psychological services).  Our precedents have considered the efficacy of IEPs' treatment of behaviors in particular cases; they should not be read as approving the practice of routinely omitting an FBA.  New York regulations do not permit this shortcut.

Additionally, New York regulations require that an IEP provide for parent counseling and training for the parents of autistic children.  N.Y. Comp. Codes R. & Regs. tit. 8 §, 200.13(d).  "Parent counseling and training means assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program."  § 200.1(kk).

Although violating New York's regulations, the failure to include parent counseling in the IEP is less serious than the

46

omission of an FBA. Whereas the FBA must be conducted in advance to ensure that the IEP is based on adequate information, the presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy of the plan. See K.E., 647 F.3d at 811. Moreover, because school districts are required by section 200.13(d) to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are not receiving this service. In contrast, the sole value of an FBA is to assist in the drafting of the IEP. Therefore the failure to conduct an FBA at the proper time cannot be rectified by doing so at a later date. Though the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement.

We emphasize again that even minor violations may cumulatively result in a denial of a FAPE. School districts are well-advised to ensure the IEP complies with the checklist of requirements specified by state regulations.

**IV. Specificity of Placement Decisions**

The parents also contend that the Department committed a procedural violation in each of these cases by failing to inform them of the exact school at which their child would be placed at the IEP meeting or in the final IEP. The Department's practice is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation, or FNR identifying a specific school at a later date. The parents are then able to visit the placement before deciding whether to accept it.

The parents argue that this practice violates 20 U.S.C. § 1414(e), which mandates that: "Each local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." Federal regulations further specify that parents must be part of any group making a "placement decision." 34 C.F.R. § 300.501(c)(1). We have held, however, that the term "educational placement" refers "'only to the general type of educational program in which a child is placed.'" T.Y., 584 F.3d at 419 (quoting Concerned Parents v. N.Y.C. Bd. of Educ., 629 F.2d 751, 756 (2d Cir. 1980)). "[T]he requirement that an IEP specify the 'location' does not mean that the IEP must specify a specific school site." Id. The Department may select the specific school without the

48

advice of the parents so long as it conforms to the program offered in the IEP. Id. at 420.[5]

**Application of Relevant Law to the Three Cases**

**A. R.E. and M.E., No. 11-1266-cv**

The parents of J.E. allege that the IEP was substantively deficient because their child required 1:1 teacher support and the IEP offered only 1:1 support by a paraprofessional aide. They further allege procedural violations because the Department failed to conduct an adequate FBA and did not include parent counseling in the IEP. The district court agreed with the IHO that there had been a substantive violation. It rejected the SRO's conclusion that 1:1 paraprofessional support would be sufficient, saying that such a conclusion lacked evidentiary support and ignored uncontradicted evidence that J.E. needed 1:1 teacher support. R.E., 785 F. Supp. 2d at 42. We disagree.

---

[5] The parents also allege that they were entitled to participate directly in school-specific placement decisions due to a stipulation reached in a 1979 class action suit. See Jose P. v. Ambach, 557 F. Supp. 1230 (S.D.N.Y. 1983). However, the certified class in Jose P. encompassed "all handicapped children between the ages of five and twenty-one living in New York City . . . who have not been evaluated within thirty days or placed within sixty days of [notification to the Department]." Id. at 1239-40. Since the plaintiffs in these cases were timely evaluated, the Jose P. stipulation does not apply to them. See R.E., 785 F. Supp. 2d at 43-44.

49

**1. Substantive Adequacy**

The SRO relied heavily on retrospective testimony by Peter De Nuovo, who would have been J.E.'s teacher if he had accepted the Department's placement. The SRO cited specific classroom techniques that De Nuovo used, and noted that if J.E. required more 1:1 instruction than his paraprofessional provided, De Nuovo would have provided it. The SRO's reliance on De Nuovo's testimony was inappropriate. At the time the parents made their placement decision, they had no way of knowing, much less a guarantee, that J.E. would be taught by De Nuovo as opposed to a different teacher who did not provide additional 1:1 instruction and did not use the same classroom techniques. The IEP provided for a 6:1:1 classroom with a dedicated aide and must be evaluated on that basis.

Despite his reliance on improper testimony, the SRO also based his decision on an appropriate finding: he found no evidence in the record that J.E. actually required 1:1 teacher support, as opposed to 1:1 support by a dedicated aide, to make educational progress. Similarly, although J.E. had been taught previously with ABA, the SRO found no evidence that he could not make progress with another methodology and 1:1 paraprofessional support. In so finding, the SRO reversed the IHO's conclusion, based on the same evidence, that J.E. required 1:1 teacher support. The adequacy of 1:1 paraprofessional support as opposed

50

to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence, as is the case here. Because we find this portion of the SRO's decision to be adequately reasoned, we owe it deference as the final decision of the state. We therefore find that the IEP was substantively adequate to provide J.E. with a FAPE.

**2. Procedural Violations**

J.E.'s parents also allege that the Department's failure to conduct an adequate FBA and to provide for parent counseling in the IEP deprived J.E. of a FAPE. With regard to the FBA, the SRO found that the IEP contained adequate strategies to address J.E.'s problem behaviors. He cited the use of "a visual schedule, verbal support, redirection, prompting, positive reinforcement, and the provision of a 1:1 paraprofessional to target the student's scripting, fleeing, and anxiety behaviors," as well as the use of a token economy and a consistent routine. SRO Opinion at 20, J.A. 757. The SRO also relied, however, on retrospective testimony from De Nuovo as to how he would have developed a BIP and how he would have specifically addressed certain behaviors. This retrospective testimony must be disregarded. In spite of this error, however, we conclude that the failure to create an adequate FBA did not amount to a denial of a FAPE. We note that, although they did not meet state-

imposed criteria, an FBA and BIP were created.  In addition, the McCarton reports reviewed by the CSE contained unusually extensive documentation of J.E.'s behaviors, and the IEP included numerous specific strategies to address those behaviors, including the use of a 1:1 aide to help him focus.  The SRO's reliance on the foregoing information was permissible and is entitled to deference.

The SRO's reliance on retrospective testimony that parent training would have been offered at J.E.'s placement was inappropriate.  However, we conclude that the failure to include parent training in the IEP did not rise to the level of a denial of a FAPE, even when considered cumulatively with the deficiencies in the FBA.

We have reviewed J.E.'s parents' other claims and find that they have not demonstrated that J.E. was denied a FAPE for the 2008-09 school year.  Accordingly, the judgment of the district court is reversed.

**B. R.K., No. 11-1474-cv**

R.K.'s parents allege that R.K. was denied a FAPE because (1) the Department failed to conduct an FBA despite R.K.'s serious behavioral problems; (2) the IEP lacked the required provisions for parent counseling and speech and language therapy; and (3) the proposed placement offered insufficient 1:1 remedial

instruction and ABA instruction.  The district court adopted a recommended ruling from the magistrate judge, relying on the conclusions of the IHO, finding that R.K. had been denied a FAPE for those reasons.  We agree.

**1. Substantive Adequacy**

The IHO concluded that "there is no one unanimous theory as to whether this student needs 1:1 or just a highly structured environment.  There is a consensus that the student needs an ABA program, speech and language and occupational therapy."  IHO Opinion at 5, J.A. 677.  The SRO disagreed.  He concluded that the evidence only indicated that R.K. needed a small, structured setting, which he found to be satisfied by a 6:1:1 placement.  He also found that she did not necessarily need ABA because some evaluations did not specify a teaching method.  The SRO also cited extensive testimony from Leonilda Perez, who would have been R.K.'s teacher at the proposed placement, about techniques she used in the classroom.  The SRO noted that Perez conducted at least 25 minutes of daily 1:1 ABA instruction, including manding, with each student.  The SRO emphasized this testimony in concluding that the placement was appropriate, finding "the student would have received individual instruction and that instruction would have been ABA-based."  SRO Opinion at 19.

The SRO's reliance on Perez's testimony was inappropriate.  R.K.'s parents had no knowledge or guarantee from the IEP that

R.K. would have received a teacher who conducted daily 1:1 ABA sessions with each student. The rest of the SRO's decision on this issue was based on permissible evidence. However, we agree with the magistrate judge that the SRO's conclusion is contrary to the overwhelming weight of the evidence. R.K., 2011 WL 1131492, at *23. As described in detail by Judge Mann, the majority of the reports recommended 1:1 instruction. Even those reports that did not specifically recommend a 1:1 ratio emphasized that R.K. needed a high level of support. Further, almost all of the reports found that R.K. needed continued ABA therapy. The fact that some reports did not mention a specific teaching methodology does not negate the clear consensus that R.K. required ABA support. However, the plan proposed in her IEP offered her a 6:1:1 classroom with no dedicated aide and no guarantee of ABA therapy or any meaningful 1:1 support. Because the SRO's conclusion was against the weight of the evidence and thus flawed, deference to it is not warranted. But having reviewed the record, we conclude that the IHO's decision was sufficiently supported, and we therefore defer to the IHO's conclusion that the IEP was not reasonably calculated to create educational benefit for R.K.

**2. Procedural Violations**

Our conclusion that the IEP was inadequate is reinforced by the CSE's failure to create an FBA or BIP for R.K. As noted

54

earlier, failure to conduct an FBA is a particularly serious procedural violation for a student who has significant interfering behaviors. The IEP itself notes that R.K. exhibited "self-stimulatory behaviors which interfere with her ability to attend to tasks and to socially interact with others." IEP at 3, J.A. 610. All of the reports considered by the CSE agreed that R.K. had behavioral difficulties. See R.K., 2011 WL 1131492, at *18 (summarizing record evidence of R.K.'s interfering behaviors). The SRO concluded that an FBA was not required because R.K.'s behaviors were "not unusual for a student with autism" and because R.K.'s preschool teacher did not think an FBA was necessary. SRO Opinion at 22, J.A. 765. However, New York regulations mandate that an FBA be developed when a student has behaviors that impede her learning. N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v). Record evidence that R.K. did have such behaviors was clear and uncontradicted. The SRO's reliance on Perez's retrospective testimony that she would have created a BIP once R.K. was in her class was not appropriate and must be disregarded. Accordingly, we conclude that the failure to create an FBA compounded the IEP's substantive deficiency, resulting in the denial of a FAPE. Our conclusion that the IEP was inadequate is buttressed by the CSE's failure to include statutorily mandated speech and language therapy and parent training in the IEP.

We further affirm the district court's conclusion that BAC was an appropriate school placement and that the equities favor reimbursement.  We conclude that the partial reduction of the award by the IHO for perceived inadequacies in the BAC program was erroneous for the reasons cited by Judge Mann.  R.K., 2011 WL 1131492, at *26-27.  Accordingly, we affirm the judgment of the district court awarding full reimbursement.

**C. E.Z.-L., No. 11-655-cv**

E.Z.-L.'s parents allege that E.Z.-L. was denied a FAPE because (1) the Department failed to conduct an FBA, (2) the IEP did not include parent training, and (3) the proposed placement was inadequate because that school did not provide its students with the appropriate occupational therapy.  The district court affirmed the SRO and found that E.Z.-L. was not denied a FAPE. We agree.

**1. Substantive Adequacy**

We conclude that the Department's proposed placement was substantively adequate.  Unlike the other two cases before us, E.Z.-L.'s parents do not seriously challenge the substance of the IEP.  Instead, they argue that the written IEP would not have been effectively implemented at P.S. M094 because "defendant's own internal documents show that a large percentage of students at P.S. M094 have been and continue to be 'underserved' for

related services, particularly as to occupational therapy." Appellant's Br. at 44-45. Our evaluation must focus on the written plan offered to the parents, however. Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement. A suggestion that some students are underserved cannot overcome the "particularly important" deference that we afford the SRO's assessment of the plan's substantive adequacy. See Cerra, 427 F.3d at 195. An IEP need only be reasonably calculated to provide likely progress, id., and after reviewing the record, we conclude that the SRO had ample evidence to find that the IEP met this standard.

E.Z.-L.'s parents also challenge the IEP's lack of a transition plan, but they have not identified any legal requirement that an IEP contain a transition plan, nor have they articulated why the absence of such a plan was so significant as to deny E.Z.-L. a FAPE.

**2. Procedural Violations**

With regard to the FBA, the SRO concluded that there was no violation because the CSE, relying in part on testimony from Rebecca Starr, E.Z.-L.'s teacher, found that her behavior "does not seriously interfere with instruction." IEP at 4, J.A. 556. This is not a case where an FBA was required but not conducted. Instead, the CSE considered the evidence of E.Z.-L.'s behaviors and determined that they were not severe enough to warrant an

FBA.  The SRO concluded that the CSE's decision was appropriate based on the evidence.  Because the record adequately supports this conclusion, we defer to the SRO.

With regard to the absence of parent training in the IEP, the SRO found no violation because training services were available at the proposed placement.  Although the SRO's use of retrospective evidence was inappropriate, we find that this violation on its own does not establish denial of a FAPE.

Accordingly, we agree with the district court that E.Z.-L. was not denied a FAPE for the 2008-09 school year.  The judgment of the district court is affirmed.

**CONCLUSION**

We reiterate our principal holding that courts must evaluate the adequacy of an IEP prospectively as of the time of the parents' placement decision and may not consider "retrospective testimony" regarding services not listed in the IEP.  However, we reject a rigid "four-corners rule" that would prevent a court from considering evidence explicating the written terms of the IEP.

In light of this holding, and for the other reasons stated above, we AFFIRM the judgment of the district court in R.K. v. N.Y.C. Dep't of Educ., No. 11-1474-cv and E.Z.L. v. N.Y.C. Dep't of Educ., No. 11-655-cv, and REVERSE the judgment of the district court in R.E. v. N.Y.C. Dep't of Educ., No. 11-1266-cv.