**Z.C., individually and on behalf of his minor child E.C., Plaintiffs,**

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, New York City Board of Education, and Carmen Farina, in her official capacity as Chancellor of the New York City Department of Education, Defendants.**

15–CV–3622 (DAB)

United States District Court, S.D. New York.

Signed November 28, 2016

David Lender, Deborah Jane Cooper, Jared R. Friedmann, Irisa Chen, Weil, Gotshal & Manges LLP, Rebecca Caren Shore, Advocates for Children of New York, Inc., New York, NY, for Plaintiffs.

Neil Anthony Giovanatti, New York City Law Department, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

DEBORAH A. BATTS, United States District Judge.

Plaintiff Z.C., individually and on behalf of his minor child E.C. (collectively, "Plaintiff"), filed this action against New York City Department of Education, New York City Board of Education, and Carmen Farina, in her official capacity as Chancellor of the New York City Department of Education (collectively, "DOE" or "Defendants"), on May 8, 2015, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiff seeks reversal of an administrative decision of the State Review Officer ("SRO"), which denied private school tuition reimbursement for E.C. Both Parties now move for summary judgment. For the reasons stated herein, Plaintiff's Motion for Summary Judgment is DENIED and De-

fendants' Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

### A. Legal Framework

■ Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A), (B). States that offer a free appropriate public education ("FAPE") to all children with disabilities are eligible for federal funding under the IDEA. 20 U.S.C. § 1412(a)(1)(A). For a state to receive funding, it must provide each disabled child with an Individualized Educational Program ("IEP"), a "written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507–08 (2d Cir. 2006) (quoting Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). The IEP must offer special education and related services commensurate with each child's need and be "reasonably calculated to enable the child to receive educational benefits." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (citation omitted).

New York law charges local Committees on Special Education ("CSEs") with the responsibility of formulating IEPs. N.Y. Educ. Law § 4402(1)(b)(1); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012). Each CSE is comprised of the child's parent(s) or guardian(s), the child's regular education teacher, the child's special education teacher, and a school psychologist, among other individuals. N.Y. Educ. Law § 4402(1)(b)(1)(a). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107–08 (citing N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8, § 200.1(ww)(3)(i)).

Parents who believe that the state has failed to offer their children a FAPE may file a due process complaint that challenges the adequacy of the IEP. R.E., 694 F.3d at 175. A hearing is then held before an Impartial Hearing Officer ("IHO"). N.Y. Educ. Law § 4404(1). At the IHO hearing, the school district bears the burden of proving the adequacy of the proposed IEP and the parent seeking tuition reimbursement for an alternative placement bears the burden of proving that the placement is appropriate. N.Y. Educ. Law § 4404(1)(c); accord M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 224–25 (2d Cir. 2012). The IHO's decision may be appealed to a State Review Officer ("SRO"), see 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), whose decision may be further challenged in state or federal court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a).

A parent opposed to his or her child's IEP may also, at his or her own risk, unilaterally place the child in a private school and seek retroactive tuition reimbursement. 20 U.S.C. § 1412(a)(10)(C)(ii); Gagliardo, 489 F.3d at 111. The reimbursement covers "expenses that [the school district] should have paid all along and would have borne in the first instance had it developed a proper IEP." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (citation

omitted). The present case comes to the Court following a unilateral placement by Plaintiff after both IHO and SRO decisions found that the DOE offered E.C. a FAPE for the 2013–2014 school year.

### B. Factual Background

#### 1. E.C.'s Educational and Medical History

Plaintiff is the parent of E.C., a seven-year-old boy diagnosed with Pervasive Neurodevelopmental Disorder, Not Otherwise Specified ("PDD") on the autism spectrum. (Administrative Record "AR" 1094.) The DOE has recognized him as a student with a disability since 2011, and classified him specifically as a student with autism. (Id.) E.C.'s condition impacts his ability to self-regulate across a wide range of emotions. (AR 959.) When E.C. becomes dysregulated, he may act out by shouting, throwing objects, banging his head, running out of the room, or withdrawing from interactions. (AR 668–69; 822; 959.) E.C.'s condition also affects his ability to stay focused and engaged for long periods of time. (IEP 4; AR 1052.) E.C. generally makes 3–5 word utterances, and will only speak in full sentences when motivated. (IEP 1; AR 1049.) In addition, E.C. often requires adult support to initiate and sustain peer and familial interactions. (AR 779; IEP 2; AR 1050.)

Ever since kindergarten, E.C. has attended the Rebecca School, a private school. (AR 839.) During the 2012–2013 school year, E.C. was in a classroom at the Rebecca School with eight students, three paraprofessionals and one teacher. (AR 939; 953.)

#### 2. The 2013–2014 IEP

The DOE convened a CSE meeting on April 11, 2013, to create an IEP for E.C. for the 2013–2014 school year. (AR 1094.) Present at the meeting were: (1) Z.C.; (2) E.C.'s teacher at the Rebecca School; (3) a Rebecca School social worker; (4) a DOE special education teacher; (5) a DOE School Psychologist and District Representative; and (6) a parent member. Id.

At the meeting, the CSE considered input from the participants and a progress report from the Rebecca School. The CSE also considered Z.C.'s oral overview of the results of a private neuropsychological evaluation of E.C. that he had obtained. (AR 349–50, 769.) This evaluation recommended that E.C. "remain in a small, structured specialized education setting that has a therapeutic component to address his emotional, behavioral and social needs." (AR 990.) None of the DOE participants at the meeting had met with E.C. or observed him before creating the IEP. (AR 369.)

The DOE recommended placing E.C. in a 6:1:1 classroom, with six students, one teacher, and one paraprofessional. (AR 599.) E.C.'s teacher expressed concern at the meeting that this placement might not provide enough adult support for E.C., who she believed needed at least one adult present to co-regulate. Id. E.C.'s teacher instead recommended placement in a 2:1 classroom. (AR 600–01.)

After the meeting, the CSE team developed an IEP for E.C. that recommended placement in a 6:1:1 special education class for a 12-month school year, set to begin on July 8, 2013. (IEP 9; AR 1057.) The IEP also recommended that E.C. be provided with a number of therapeutic services throughout the week, including speech and language therapy three times individually and twice in a small group, occupational therapy twice individually and once in a small group, counseling twice individually, and physical therapy twice individually. (Id.) Finally, the IEP recommended that E.C. have access to various sensory supports, including a sensory gym, brushing and squeezing techniques, and sensory

equipment such as Foofs and foam steps. (AR 1052–54.)

### 3. Unilateral Placement in Rebecca School

Under the DOE's recommended timeline, it was required to extend a placement offer to Plaintiff by June 15, 2013, which it failed to do. (Chen Decl. Ex. A.)[1] On June 17, 2013, Plaintiff, through his attorney, sent a letter to the DOE stating that he intended to place E.C. in the Rebecca School for the 2013–2014 school year, but that he would consider any belated placement offer from the DOE. (AR 910.) On June 19, Plaintiff received two separate and successive Final Notices of Recommendation ("FNRs") from the DOE, the first recommending placement in the Rebecca School, and the second recommending a different placement in P.S. 138. (AR 790.)

Plaintiff visited P.S. 138 on June 25, 2013. (AR 1095.) While there, he met with the Assistant Principal, the Unit Coordinator ("UC"), and an occupational therapist ("OT"), and took a tour of two 6:1:1 classrooms. (AR 794–95; 809.) The classrooms Plaintiff visited were arranged with one horseshoe table for group work and a row of independent workstations, each with a desk and a divider. (AR 496.) Plaintiff noticed that the walls had a lot of potentially distracting material posted on them, and described the classroom's physical layout as "very tight." (AR 796–97.) Although the classroom had what the UC referred to as a "sensory corner," it appeared to Plaintiff to be no more than two bookshelves with a cardboard cover. (AR 798.)

Plaintiff also visited the school's Occupational Therapy/ Physical Therapy ("OT/PT") room, which appeared to Plaintiff to be approximately half the size of the classroom, with padding covering about 3/4 of the walls. (AR 809.) The room had a trampoline, but Plaintiff did not see any swings, Foofs, or sensory balls. (AR 811.) The school did not have a room referred to as an equipped sensory gym. (AR 475.) When Plaintiff asked the UC about sensory equipment, she responded that she could get whatever equipment was listed in the IEP. (AR 812.) However, when Plaintiff asked the OT about the sensory techniques listed in the IEP, including brushing and deep pressure squeezes, he claims that she "did not know what [Plaintiff] was talking about" and "was unable to answer [the] questions." (AR 810.)

On June 27, 2013, Plaintiff, through counsel, sent a letter to the DOE rejecting the placement at P.S. 138, but maintaining that he would consider an alternative placement if offered. (AR 915–16.) The DOE did not respond to this letter. (AR 817.) On the same day, Plaintiff signed an enrollment contract with the Rebecca School for the 2013–2014 school year. (AR 994.) The contract allowed Plaintiff to withdraw and receive a tuition reimbursement if he subsequently enrolled E.C. in a DOE-recommended school in accordance with his IEP. (AR 995.)

### 4. The IHO Hearing

On September 13, 2013, Plaintiff filed an Impartial Hearing Request seeking reimbursement of the Rebecca School tuition for the 2013–14 school year. (AR 884.) The hearing before the IHO began on November 7, 2013. (AR 21.) Testifying for the DOE were the DOE psychologist and the UC from P.S. 138. (AR 22.) Plaintiff testified on his own behalf, along with, inter alia, the neuropsychologist who had evaluated E.C., E.C.'s teacher, E.C.'s OT, and a

---

1. Although this evidence was excluded by the IHO, the Court "may consider evidence that is not part of the administrative record at the request of a party." J.C. v. N.Y.C. Dep't of Educ., 15 Civ. 3345(LAK)(AJP), 2015 WL 8940044, at *13 (S.D.N.Y. Dec. 16, 2015).

law student from Plaintiff's counsel. (AR 22–23.) Together, the parties submitted 26 documents into evidence, including 18 from Plaintiff and eight from the DOE. (IHO Dec. 3–4; AR 25–26.)

Plaintiff presented progress reports from the Rebecca School and testimony from E.C.'s teacher describing how in the past year, E.C. was able to remain regulated, interact with others and monitor his own regulation for increasing periods of time. (AR 640.) However, E.C.'s teacher testified that E.C. still became dysregulated frequently, and required 1:1 adult support in order to re-regulate. (AR 641; 694.) E.C.'s neuropsychologist testified that E.C. "needs a 2:1 to maintain his focus." (AR 554.)

During her testimony, the UC stated that P.S. 138 does not "have any Foofs," and that she had never heard of a "Foof" prior to the present litigation. (AR 514.) She also testified that while the school "do[esn't] have a sensory gym ... we do have an OT/PT room" with what she understood to be the same equipment and set-up as a sensory gym. The UC explained that the school also uses the gymnasium for students with similar goals in their IEPs. (AR 475–80.)

On March 18, 2014, the IHO issued a decision finding that the DOE had offered E.C. a FAPE for the 2013–14 school year, and accordingly, that Plaintiff was not entitled to receive tuition reimbursement. (See IHO Dec.; AR 24.) The IHO did not consider Plaintiff's challenge to P.S. 138's ability to implement the IEP, reasoning that such a prospective challenge was barred under then-current law. (IHO Dec. 13; AR 35.)

5. The SRO Appeal and Current Action

Plaintiff appealed the IHO decision to the SRO on the grounds that (1) the IEP was inappropriate, and (2) P.S. 138 was unable to implement it. (AR 42.) On January 9, 2015, the SRO affirmed the IHO's decision in all respects. (AR 6–15.) In particular, the SRO found that the IEP was substantively adequate, and like the IHO, rejected Plaintiff's challenge to the placement as impermissibly speculative. (Id.)

Plaintiff brought the current action seeking a reversal of the SRO decision and reimbursement of tuition paid to the Rebecca School for the 2013–2014 school year. Plaintiff again argues that E.C. was denied a FAPE for the 2013–14 school year both because the IEP was inadequate and because P.S. 138 was unable to implement it.

## II. DISCUSSION

### A. Legal Standard

#### 1. Summary Judgment Standard

IDEA actions are generally resolved on summary judgment. See, e.g., S.H. and B.P. ex rel. S.H. v. New York City Dep't of Educ., No. 10 Civ. 1041(PKC), 2011 WL 666098 (S.D.N.Y. Feb. 15, 2011); Thies v. N.Y.C. Bd. of Educ., No. 07 Civ. 2000(RMB), 2008 WL 344728 (S.D.N.Y. Feb. 4, 2008). A federal court reviewing administrative proceedings under IDEA "shall receive the records of the administrative proceedings"; "shall hear additional evidence at the request of a party"; and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415 (i)(2)(C).

■ "The Supreme Court and our Court have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 380–81 (2d Cir. 2003) (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 204–08, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir.

1998)). The reviewing federal court "must give due weight to the administrative proceedings, mindful that the judiciary lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Grim, 346 F.3d at 381 (internal quotation marks omitted). Thus, deference is especially appropriate when reviewing administrative decisions assessing the "appropriate educational methodology" encompassed in an IEP. M.H., 685 F.3d at 244.

■ Deference is also due when "the state hearing officers' review has been thorough and careful," Walczak, 142 F.3d at 129, although the degree of deference is generally limited to the extent to which an administrative opinion is well-reasoned, considering both supportive and contradictory evidence. F.O. v. N.Y.C. Dep't of Educ., 976 F.Supp.2d 499, 514 (S.D.N.Y. 2013). Decisions where both the IHO and SRO are in agreement are particularly persuasive. C.H. v. Goshen Cent. Sch. Dist., No. 11–CV–6933 (CS), 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013). However, no deference is due with respect to issues of law. F.L. v. N.Y.C. Dep't of Educ., 15–cv–520, 2016 WL 3211969, at *7 (S.D.N.Y. June 8, 2016).

## 2. Tuition Reimbursement

■ The Supreme Court has set out a three-step test (the "Burlington–Carter test"), to determine whether to award retroactive private school tuition funding to an aggrieved parent under the IDEA. School Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The DOE is required to pay for a program selected by the parent only if (1) the IEP proposed by the school district was inappropriate, (2) the private placement was appropriate for the child's needs, and (3) the equities support

the parent's claim. Id. at 374, 105 S.Ct. 1996.

Subsequent Second Circuit decisions have established that a plaintiff may challenge the adequacy of an IEP not only by showing the IEP itself to be inappropriate, but by showing that the proposed placement was unable to implement the IEP. See M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 244 (2d Cir. 2015); B.P. v. N.Y.C. Dep't of Educ., 634 Fed.Appx. 845, 848 (2d Cir. 2015) (summary order). Plaintiff here makes both challenges, and the Court addresses each in turn.

### A. Adequacy of IEP

■ For an IEP to be adequate, it must be "reasonably calculated to enable the child to receive educational benefits," Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The IEP need not provide a child with "optimal" programming, but only a "basic floor of opportunity . . . likely to produce progress, not regression." C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014) (quotation marks and citation omitted). Deference to the decision of the SRO is "particularly important" when reviewing the substantive adequacy of an IEP. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005).

■ Here, Plaintiff argues that the 6:1:1 placement recommendation in E.C.'s IEP rendered the IEP substantively inadequate. Relatedly, Plaintiff contends that both the IHO and the SRO failed to deal adequately with the contradictory evidence presented at the hearing, and as such, their opinions are insufficiently reasoned and undeserving of deference. In support of this argument, Plaintiff claims that both the SRO and the IHO (1) failed to consider the evidence showing that E.C. required frequent 1:1 adult support, and (2) ignored the context in which E.C.'s recent progress had occurred–namely, his 8:3:1 classroom at the Rebecca School. Because of this,

Plaintiff argues, the IHO and SRO decisions ignored the weight of the evidence, which demonstrated that E.C. could not progress in a 6:1:1 setting.

The DOE does not claim that the evidence Plaintiff presented at the hearing was unpersuasive or should be ignored. Instead, the DOE contends that a 6:1:1 setting would provide E.C. with the type of support that Plaintiff claims he needs. Similarly, the DOE argues that the SRO and IHO did not ignore Plaintiff's evidence, but rather, relied on and incorporated it into their decisions.

The Court agrees that Plaintiff's claim that the SRO "cited only DOE witnesses while excluding any reference to the parent's witnesses," Pl.'s MSJ 23, is unsupported. Contrary to Plaintiff's assertion, the SRO decision includes multiple references to Plaintiff's testimony and exhibits, and more importantly, summarizes and confronts Plaintiff's central argument. (See SRO Dec. 5–8; AR 10–13.)

The SRO "was not required to explicitly rebut all overlapping testimony that primarily served only to corroborate Plaintiff's core position," J.D. ex rel. A.P. v. N.Y.C. Dep't of Educ., 14–CV–9424, 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) (citing J.S. v. N.Y.C. Dep't of Educ., 104 F.Supp.3d 392, 402 (S.D.N.Y. 2015)). Instead, it is sufficient that the SRO "acknowledge[s] the position" of Plaintiff's witnesses "before explaining why he disagree[s] based on his view of the evidence." A.A. v. N.Y.C. Dep't of Educ., 14 Civ. 8483 (ALC), 2015 WL 10793404, at *10 (S.D.N.Y. Aug. 24, 2015).

Here, the testimony of Plaintiff's witnesses that was not expressly cited in the SRO decision was all essentially duplicative of Plaintiff's own assertions. And while the SRO did not attribute Plaintiff's argument to each of its sources, the SRO decision acknowledged that "the parent asserts that the student frequently 'dysregulates' during the day, requiring 1:1 adult support" and "when ... regulated, he requires 2:1 adult support." (SRO Dec. 5; AR 10.) No additional testimony would have served to vary this position. Thus, although the SRO may have "primarily cited testimony from the DOE," his decision "explicitly address[ed] the sort of ... concerns" underlying Plaintiff's testimony, including, most significantly, that E.C.'s need for adult support would not be met in a 6:1:1 setting. L.B. v. N.Y.C. Dep't of Educ., 15–CV–03176 (AJN), 2016 WL 5404654, at *20 (S.D.N.Y. Sept. 27, 2016).

Indeed, Plaintiff's evidence largely informed the reasoning in both administrative decisions. The IHO, for example, explicitly relied on the neuropsychologist report submitted by Plaintiff, quoting extensively from it and identifying the parts of the IEP that reflected its recommendations.[2] (IHO Dec. 11–13; AR 33–35.) Further, both the SRO and the IHO noted that E.C.'s progress reports, also submitted by Plaintiff, "showed an increase in [E.C.'s] ability to remain regulated ... requiring less adult support to remain engaged in activities." (SRO Dec. 7–8; AR 12–13.) This "emerging ability to monitor his own regulation" undergirded the administrative findings that a 6:1:1 placement, coupled with individual and group therapeutic services, would adequately

---

**2.** The IHO also relied on E.C.'s teacher's testimony "conced[ing] that [E.C.] does not need 1:1 support all of the time." (IHO Dec. 13, AR 35.) And while, as Plaintiff points out, the IHO mischaracterized Plaintiff's testimony as "conced[ing] that a 6:1 + 1 setting could be appropriate," IHO Dec. 13; AR 35, the Court finds that this single misstatement does not invalidate or overshadow the IHO's overall consideration of Plaintiff's evidence and position, or his reasoning with respect to it.

address E.C.'s needs.[3] (IHO Dec. 13; AR 35.)

The SRO's decision also credited, rather than ignored, Plaintiff's assertion that E.C. requires direct adult support when dysregulated. In fact, the SRO based his decision in part on the DOE psychologist's testimony that if E.C. were to become dysregulated in a 6:1:1 classroom, either the teacher or the paraprofessional could provide him with the necessary sensory support. (SRO Dec. 6–7; AR 11–12.) The psychologist's testimony illustrated exactly how a 6:1:1 placement could meet the needs described by Plaintiff, and served as an appropriate basis for the SRO's decision.[4] Cf. A.M. v. N.Y.C. Dep't of Educ., 14–CV–9224 (JPO), 2015 WL 8180751, at *6 (S.D.N.Y. Dec. 7, 2015) (testimony describing 6:1:1 setting as "an intense and full-time setting, in which 'professionally trained individuals' use multiple methodologies, including potentially ABA," properly credited by SRO).

Moreover, even standing alone, Plaintiff's evidence does not necessarily lead to the conclusion he urges. For instance, while Plaintiff's witnesses were consistent in testifying that E.C. needs direct adult support when dysregulated, there was no clear consensus that this support was only possible in a 2:1 setting. Indeed, only the neuropsychologist testified that E.C. "needs" a 2:1 setting, see AR 554—a claim that, as the IHO highlights, conflicts with her earlier written evaluation, which included no such recommendation. (IHO Dec. 13; AR 35.) E.C.'s teacher, on the other hand, merely testified that she "find[s] that [E.C.] is successful in [the] 2:1 ratio" at the Rebecca School. (AR 600.) Of course, E.C.'s observed success in an 8:3:1 classroom in no way disproves his potential for success in a 6:1:1 setting. In any case, even if Plaintiff's witnesses had unanimously concluded that E.C. required a 2:1 setting, the CSE team "is not required to adopt every recommendation Plaintiffs' witnesses make." M.L. v. N.Y.C. Dep't of Educ., No. 1:13–cv–00574 (ALC)(JLC), 2014 WL 1301957, at *11 (S.D.N.Y. Mar. 31, 2014); cf. J.D., 2015 WL 7288647, at *14.

An independent review of the record "shows only that [E.C.] need[s] individual support in particular situations," such as when "he becomes ... upset during a task," T.C. v. N.Y.C. Dep't of Educ., 15–CV–3477 (VEC), 2016 WL 1261137, at *12 (S.D.N.Y. Mar. 30, 2016), which E.C.'s teacher testified happens only a few times a day. (AR 588.) Further, E.C.'s current

---

**3.** While the SRO's reasoning with respect to this point was perhaps not as well-developed as the IHO's, the Court is entitled to defer to the IHO's decision when the quality of its reasoning transcends the SRO's. See F.O., 976 F.Supp.2d at 511–12.

**4.** The Court notes that while this testimony might, at first glance, appear to be the type of "retrospective testimony" barred at these hearings, see R.E., 694 F.3d at 186, its purpose is to "explain or justify" the IEP's 6:1:1 recommendation rather than amend or vary it, and thus, it was properly considered by the SRO. Id. at 186; see also id. at 186–87 ("[R]etrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered ... [but] a school district may introduce evidence explaining how [the 6:1:1] structure operates and why it is appropriate."). However, as Plaintiff points out, not every part of the SRO's decision passes this test: In a footnote, the SRO states that there "is nothing to stop the district from providing additional adult support to the student if it is determined to be appropriate." (SRO Dec. 8 n.5; AR 13.) Although not testimony per se, this reasoning suggests that the DOE could provide services beyond those listed in the IEP, and thus, it should not have served as a basis for the SRO's decision. Like the IHO's decision, however, see supra note 2, the Court finds this mistake too minimal to undermine the rest of the SRO's reasoning.

classroom at Rebecca School requires him to participate regularly in a number of group activities. (See AR 654–55.) Thus, "taking into account [E.C.]'s needs" for only intermittent direct support and his "capacity to function in a group setting"– along with the IEP's provision of 1:1 therapeutic support throughout the week–the SRO reasonably determined that the 6:1:1 setting was adequate. T.C., 2016 WL 1261137, at *12; cf. E.E. v. N.Y.C. Dep't of Educ., No. 13 Civ. 06709(LGS), 2014 WL 4332092, at *9 (S.D.N.Y. Aug. 21, 2014) (approving 6:1:1 setting and relying in part on the fact that in his prior "8:1:3 class, [the student] routinely received instruction in group settings.").

Plaintiff argues that the SRO based his conclusion wholly on a state regulation, 8 NYCRR § 200.6(h)(4)(ii)(a), that provides that 6:1:1 is the maximum class size for students with a need for a "high degree of individualized attention." (Pl.'s MSJ 22). According to Plaintiff, the SRO's reliance on this regulation was improper because the regulation does not prevent the DOE from offering E.C. a *higher* degree of adult support, and so cannot be used as evidence that the IEP is appropriate. The SRO's determination, however, did not rely solely on this regulation, but instead used it as one piece of evidence that, in conjunction with the reports and testimony cited throughout his opinion, demonstrates the placement's methodological adequacy. While this regulation would not by itself save an insufficient IEP, the SRO was not wrong to refer to it in support of his decision. See T.C. v. N.Y.C. Dep't of Educ., 15 Civ. 2667 (KPF), 2016 WL 4449791, at *22 (S.D.N.Y. Aug. 24, 2016) (affirming the decision of the SRO based in part on state regulation).

Similarly, Plaintiff argues that the POE only offered the 6:1:1 placement because that was "what they have available," as

Plaintiff testified that the POE psychologist told him. (AR 786.) Even crediting this testimony, it is not the decision-making process of the POE psychologist that the Court is reviewing, but the adequacy of the IEP and the reasoning underlying the administrative opinions. Here, the SRO "took into account the CSE's consideration of larger class sizes" and their ultimate finding that both were "insufficiently supportive." T.C., 2016 WL 4449791, at *22. This was not an inappropriate consideration, and it was not the only consideration.

Plaintiff finally argues that the SRO's decision was invalid because the DOE participants in the IEP meeting had never met E.C., and cites C.L. v. N.Y.C. Dep't of Educ., No. 12 Civ. 1676 (JSR), 2013 WL 93361 (S.D.N.Y. Jan. 3, 2013), as support. (Pl.'s Reply at 5). In C.L., the district court reversed the SRO's decision and instead deferred to the IHO's "far better reasoned" determination that the 6:1:1 placement was inadequate for the student. Id., at *8. The IHO's decision was based on the student's "particularly intense" behavioral issues, Id. the fact that he would have been grouped with students with "significantly higher functioning levels," Id., at *4, and the testimony of both the student's school director and teacher that they had "unequivocal[ly] conclu[ded]" that the student "require[d] a one-on-one" setting. Id., at *6. None of these considerations are present in the instant case. Here, both the IHO and the SRO agree that the placement was appropriate, and there was no unequivocal or even consistent testimony that E.C. could not progress outside of a 1:1 setting. Moreover, courts in this district have found no requirement that the DOE representatives meet directly with the student if the IEP is otherwise supported. See, e.g., A.M., 2015 WL 8180751, at *5.

In sum, the IHO and the SRO concluded, after considering the evidence submitted by the parties, that a 6:1:1 placement would allow E.C. to progress, both because he would have the support he needed when he became dysregulated and because he was already maintaining self-regulation for longer periods of time. The decisions emphasized that the IEP consisted not only of the 6:1:1 placement, but of a number of therapeutic services programmed to support E.C. throughout the week, including individual physical therapy, occupational therapy, and counseling, as well as access to sensory equipment.[5] (See SRO Dec. 7; AR 12.)

The Court is thus left with a question of class size and student-teacher ratio, an inquiry into educational methodology that, "[w]ithin the general parameters of 8 NYCRR § 200.6... [is] more appropriately answered by the state and district decision-makers than by federal judges." D.J. v. N.Y.C. Dep't of Educ., No. 12 Civ. 7009, 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013) (internal quotation marks omitted); accord S.A. v. N.Y.C. Dep't of Educ., No. 12–CV–435, 2014 WL 1311761, at *13 (S.D.N.Y. Mar. 30, 2014) ("Determining what class size is appropriate for a student is exactly the sort of policy judgment on which the Second Circuit has instructed that this Court should defer to the SRO." (internal quotation marks omitted)). While E.C.'s neuropsychologist and the DOE's psychologist may have disagreed on the ideal class size for E.C., "it is not for the federal court to choose between the views of conflicting experts on such questions." K.F. v. N.Y.C. Dep't of Educ., 15–cv–1126, 2016 WL 3981370, *11 (S.D.N.Y. Mar. 31, 2016). Indeed, in all of "the cases Plaintiff cites in which the federal court did overturn the SRO on a core question of educational methodology, the court deferred

to a better reasoned IHO decision"—a factor not present here, where both the SRO and IHO agree. J.D., 2015 WL 7288647, at *20 (internal citation omitted).

Moreover, the inquiry under the IDEA is not the "best possible class size" for E.C., but "whether it complied with New York regulations," and whether E.C. "was likely to progress, and not regress, within the class." N.M. v. N.Y.C. Dep't of Educ., No. 15–CV–1781 (JMF), 2016 WL 796857, at *6 (S.D.N.Y. Feb. 24, 2016) (quotation marks omitted). The placement here falls within the range prescribed by the regulations for students with the most demanding needs. See 8 NYCRR § 200.6. Because the SRO's decision is supported by the record, and "particularly given the lack of any contrary finding by the IHO," L.B., 2016 WL 5404654, at *20, the Court is ill-equipped to reverse a determination falling so squarely outside of its institutional role.

### B. Adequacy of Placement

█ The IDEA requires not only an appropriate IEP, but "placement in a school that can fulfill the requirements set forth in the IEP." D.C. v. N.Y.C. Dep't of Educ., 950 F.Supp.2d 494, 509 (S.D.N.Y. 2013) (quotation marks omitted). Prior to the Second Circuit's decision in M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236 (2d Cir. 2015), there was confusion among the district courts about whether so-called prospective challenges to a proposed placement's ability to implement the IEP were permitted. See M.T. v. N.Y.C. Dep't of Educ., 1:14–cv–10124–GHW, 2016 WL 1267794, at *10 (S.D.N.Y. Mar. 29, 2016) (comparing cases). In M.O., the court clarified that such challenges are appropriate as long as they are (1) evaluated as of the time the parent made the placement decision (i.e., "prospectively"), and (2) based on more than "mere speculation." 793 F.3d

---

5. E.C. was not receiving all of these related services at the Rebecca School. (AR 650–51.)

236, 244 (2d Cir. 2015). However, "[s]ubstantive attacks on [the] IEP ... couched as challenges to the adequacy" of the placement may not be sustained. M.O., 793 F.3d at 245.

■■■■ "While it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates," Id., a challenge is appropriate where the school is "factually incapable" of implementing the IEP. J.D., 2015 WL 7288647, at *16 (quoting K.C. ex rel. C.R. v. N.Y.C. Dep't of Educ., No. 14–cv–836 (RJS), 2015 WL 1808602, at *12 (S.D.N.Y. Apr. 9, 2015)). Where the IEP is not facially inadequate, however, the plaintiff "bear[s] the burden of proof on prospective challenges to the adequacy of a proposed placement." K.C., 2015 WL 1808602, at *12 (quoting S.W. v. N.Y.C. Dep't of Educ., 92 F.Supp.3d 143, 162 n.9 (S.D.N.Y. 2015)). Indeed, in such instances, "there will be few circumstances in which a parent can successfully challenge a placement if their child never attended the [recommended] school." J.M. v. N.Y.C. Dep't of Educ., 171 F.Supp.3d 236, 249 (S.D.N.Y. 2016); accord L.B., 2016 WL 5404654, at *22.

■■■■ Here, Plaintiff argues that the proposed placement, P.S. 138, was unable to implement the IEP because: (1) it did not have a sensory gym; (2) the OT was unfamiliar with brushing techniques; (3) it did not have foam steps or Foofs; (4) the classroom did not have the required sensory equipment; (5) the class required independent work; and (6) the classroom was too small to allow movement breaks, and the walls too visually stimulating. (Pl.'s MSJ 28–30.) Without the benefit of M.O., both the IHO and the SRO concluded that Plaintiff was barred from challenging the

placement without actually enrolling E.C. in P.S. 138, and did not address the substance of Plaintiff's argument. Since it is now clear that this conclusion is legally erroneous, the SRO's decision merits no deference with respect to this issue, and the Court reviews it de novo. See W.W. and D.C. v. N.Y.C. Dep't of Educ., 160 F.Supp.3d 618, 627 (S.D.N.Y. 2016).

■■■■ As a threshold matter, challenges to placements are evaluated prospectively, and so must be based on facts "uncovered by a parent prior to" their rejection of the placement. M.T. v. N.Y.C. Dep't of Educ., 165 F.Supp.3d 106, 120 (S.D.N.Y. 2016); cf. R.E., 694 F.3d at 187. Facts uncovered for the first time at the IHO hearing may not be considered on a prospective challenge. M.T., 165 F.Supp.3d at 120. Here, a portion of the evidence on which Plaintiff relies in making his prospective argument falls short of this standard, including the UC's testimony at the hearing that "we don't have a sensory gym at [P.S. 138]," AR 475, and that she had not heard of "Foofs" prior to the instant litigation. (See Pl.'s MSJ 29.) Plaintiff's brief pulls these quotes out of context;[6] nonetheless, they are an inappropriate basis for his prospective challenge in any event because the UC made these statements at the IHO hearing, after Plaintiff decided to enroll E.C. in the Rebecca School. Thus, the Court disregards this testimony in the context of Plaintiff's challenge to the adequacy of the placement.

The remaining evidence that Plaintiff cites does not demonstrate that P.S. 138 was factually incapable of implementing the IEP. Plaintiff's most compelling argument is that during his school tour, the OT indicated that she "did not know what

---

6. For example, immediately after testifying that they do not have something called a sensory gym at P.S. 138, the UC described

how they have an OT/PT room with what she understood to be the same equipment as a sensory gym. (AR 475.)

[Plaintiff] was talking about" after Plaintiff asked about the brushing and deep pressure protocols listed in the IEP. (AR 810.) This is not a response likely to inspire confidence in a parent, and the Court sympathizes with Plaintiff's concern. However, these comments were also made by a "single school official," who may or may not have been E.C.'s OT, and who—as the UC made clear at the hearing, see AR 456–57—would have been trained if she in fact lacked the knowledge required to perform the listed techniques. See B.P. v. N.Y.C. Dep't of Educ., 634 Fed.Appx. 845, 848 (2d Cir. 2015) (summary order) ("[I]nsofar as plaintiffs relied on information from a single school official, they bore the risk that the school district would, in fact, satisfy its burden of proving the appropriateness of the challenged placement."); see also J.D., 2015 WL 7288647, at *16 ("[S]ince there was 'no guarantee' at the time of the placement that either of these two women would be A.P.'s teacher, their personal qualifications cannot be invoked to challenge the IEP's substantive adequacy."). Indeed, "no school administrator told [Plaintiff] that PS [138] was unable to implement" the IEP, and courts in this district have repeatedly rejected similar challenges "based entirely on ... observation[s]" and the parent's "mere speculation" that a child's IEP requirements were reflected in the classroom he observed. L.C. v. N.Y.C. Dep't of Educ., 15 Civ. 4092 (PAC), 2016 WL 4690411, at *5 (S.D.N.Y. Sept. 6, 2016); see also K.C., 2015 WL 1808602, at *12 ("[Plaintiff] does not allege that P.S. 129 Center would have failed to implement sensory modification programs once C.R. enrolled, only that those programs were not 'necessary' for the students then enrolled in the class that [Plaintiff] ... observed."); J.D., 2015

WL 7288647, at *16 ("Plaintiff's own testimony that [placement school] officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was factually incapable of implementing the IEP.").

Indeed, even by Plaintiff's own admission, the UC indicated during the tour that P.S. 138 had every intention to furnish the services listed in E.C.'s IEP. (AR 811–12.) But even were that not the case, the DOE presented evidence at the hearing that any school official required to administer brushing or squeezing techniques under a student's IEP would be properly trained. (See AR 511–12; 454–56.) This was sufficient to rebut any misinformation provided by the OT during Plaintiff's school visit. See L.B., 2016 WL 5404654, at *23 (misinformation provided to parent at tour may be rebutted by DOE at impartial hearing).

Plaintiff's additional contentions are less persuasive. Plaintiff claims that during his school visit, (1) he did not see any of the required sensory equipment; (2) the UC "did not tell" Plaintiff that P.S. 138 had brushes in the classroom or Foofs; and (3) the OT "did not respond" when Plaintiff asked about the sensory equipment. (Pl.'s MSJ 29.)

The school officials, however, were under no affirmative duty to quell Plaintiff's concerns that P.S. 138 would fail to implement the IEP, particularly when many of these concerns remained unspoken during the tour.[7] The fact that Plaintiff "believed the sensory equipment was inadequate ... does not mean the school did not possess, or have the capability to acquire, appropriate equipment to fulfill the requirements in the IEP." R.B. v. N.Y.C. Dep't of Educ.,

---

**7.** For example, although the UC admitted in her testimony that she "did not tell" Plaintiff that the classroom had brushes, she also testifies that she does not remember being asked about this. (AR 511–12.)

15cv6331 (DLC), 2016 WL 2939167, at *11 (S.D.N.Y. May 19, 2016). Similarly, "[t]he fact that Plaintiff[ ] did not observe any sensory equipment on [his] site visit is insufficient to demonstrate that [the school] lacked such equipment or that the school would not obtain the equipment necessary to implement [E.C.]'s IEP should [E.C.] attend the school." N.K. v. N.Y.C. Dep't of Educ., 961 F.Supp.2d 577, 592 (S.D.N.Y. 2013). Even so, the UC appeared to make an effort to assuage Plaintiff's fears: Plaintiff admits that although the OT "did not respond" when asked about the sensory equipment, the UC immediately replied that P.S. 138 could and would get any equipment listed in E.C.'s IEP. (AR 811–12.)

In essence, all Plaintiff alleges here is that either the students in the classroom he visited did not require the sensory equipment listed in E.C.'s IEP or that this equipment was placed out of view,[8] not that the school "would have failed to implement" the required sensory "programs once [E.C.] enrolled." K.C., 2015 WL 1808602, at *12. Assuming that P.S. 138 would not implement E.C.'s IEP after receiving assurances from school officials of its intention and ability to do so amounts to the very type of speculation barred by M.O. See N.M., 2016 WL 796857, at *8 ("[A] claim based on what a school 'would not have' done—as opposed to a claim based on what the school could not do—is speculative and barred under R.E. and M.O.").

Plaintiff finally argues that the placement was inadequate because the classrooms he visited had independent workstations, were "tight and cramped," and had walls covered in visual stimuli that Plaintiff believes would trigger E.C.'s dysregulation. (Pl.'s MSJ 29–30.) These arguments fail for two reasons. First, there is no indication, based on Plaintiff's observation of the two classrooms during his tour, that P.S. 138 was factually incapable of conforming E.C.'s actual classroom to the requirements of his IEP. In fact, the UC both told Plaintiff during his visit and testified at the hearing that the school would obtain any equipment required by the IEP and alter the classroom to conform to E.C.'s IEP. (AR 452; 812.) Second, E.C.'s IEP did not actually require bare walls, spacious classrooms, or group workstations. Instead, the IEP recommended that E.C. receive adult support with various tasks and "movement activities to engage him," and was completely silent as to the condition of the walls. (See IEP 3–5; AR 1051–53.) Adult support is not incongruous with independent (and alterable) workstations; nor do movement activities demand a certain classroom size, assuming that they must take place in the classroom at all. Therefore, these arguments are challenges to the substance of the IEP rather than P.S. 138's ability to implement it, and as such, are foreclosed under M.O. See M.O., 793 F.3d at 245; L.B., 2016 WL 5404654, at *25 ("[T]he aspects of the placement challenged by the Parents are not contrary to any specific requirement in the IEP, and therefore do not constitute facial deficiencies on the part of [the placement]." (internal quotation marks omitted)). These claims thus do not amount to a permissible prospective challenge.

Accordingly, the Court finds that the DOE did not deny E.C. a FAPE by providing an inadequate placement. Because the Court finds neither the IEP nor the

---

8. Indeed, the UC testified that every classroom has beanbags in them, although at the time of Plaintiff's visit "[t]hey may have been put away if the students weren't using them or reallocated to another room." (AR 522.)

The UC also testified that they have "lots of sensory materials" in each classroom, depending on the needs of the children in the class. (AR 424.)

placement inadequate, it need not reach the second or third prongs of the Burlington–Carter test. See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000) ("Only if a court determines that a challenged IEP was inadequate should it proceed to the second question.").

### III.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

SO ORDERED.